## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| RACHEL KATE HICKS HAGAN | ) | JURY DEMAND |
| | ) | |
| | ) | Case No.: |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GLENN R. FUNK | ) | |
| (Individually and in his | ) | |
| official capacity as | ) | |
| District Attorney General of | ) | |
| Metropolitan Nashville & | ) | |
| Davidson County | ) | |
| | ) | |
| Defendant. | | |

---

## COMPLAINT

---

## INTRODUCTION

1. This Complaint arises out of Defendant Glenn R. Funk's unlawful acts of retaliation taken against Plaintiff Katie Hagan, a highly respected attorney, for her service on a jury.

2. Defendant demoted Ms. Hagan after she served on a jury in which the jury acquitted the criminal defendant on all counts of charges brought by Defendant's office, the District Attorney General of the 20th Judicial District of Tennessee.

3. Defendant specifically took issue with Ms. Hagan's vote of "not guilty," falsely asserting that her vote to acquit the criminal defendant could strain her relationship with Metro Nashville Police officers.

4. At all times, Defendant was acting in his role and capacity as an employer making internal office employment decisions, separate and apart from any prosecutorial decisions that would normally shield him from suit.

5. Plaintiff seeks reinstatement and other injunctive remedies against Defendant in his official capacity; she seeks compensatory damages and punitive damages from Defendant in his individual capacity.

## JURISDICTION AND VENUE

6. This action arises under the United States Constitution and under the laws of the United States of America, particularly under the provisions of the First and Fourteenth Amendment of the United States Constitution, and particularly under the Civil Rights Act, codified at 42 U.S.C. § 1983 et seq.

7. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) (2) because all the events giving rise to Plaintiff's claims occurred in this District.

## PARTIES

9.  Plaintiff Katie Hagan is an attorney licensed to practice law in the State of Tennessee. At all relevant times, she was employed as a prosecutor in the office of the District Attorney General of Metropolitan Nashville & Davidson County.

10. Defendant Glenn R. Funk is the elected District Attorney General of Metropolitan Nashville & Davidson County. At all relevant times, he had the capacity to make employment decisions concerning Plaintiff.

## FACTUAL BACKGROUND

### I.        Jury Service

11. In January 2024, Katie Hagan started working as an Assistant District Attorney for the District Attorney General of the 20th Judicial District of Tennessee.

12. Prior to serving as an Assistant District Attorney, Katie Hagan was an accomplished criminal defense attorney.

13. She worked in the law firm of Hagan and Todd with the Honorable Jim Todd, who is now a General Sessions Court Judge in Division VI in Davidson County.

14. Katie Hagan also worked as an attorney for the Tennessee Innocence Project.

15. In announcing the hiring of Katie Hagan, the Defendant, on an official social media channel, praised Ms. Hagan as a "highly respected attorney," noting both her work in private practice and with the Tennessee Innocence Project:



*X.Com post of @DavidsonCoDA on January 10, 2024, available at
https://x.com/DavidsonCoDA/status/1745184299161145550*

16. The Office of the District Attorney General of the 20th Judicial District of Tennessee has an employee manual with a specific policy governing jury duty service by employees of the D.A.'s office. Policy 3.20, titled "Jury Duty," reads:

> Jury service is a responsibility of good citizenship, and all employees are expected to honor subpoenas for jury duty in any court. **It is the office policy that employees serve rather than seek to be excused or exempted. Jury service is both a privilege and an obligation.** Our court system is founded upon the right to a jury trial, and all citizens should participate in order to insure [*sic*] that this right is meaningful. Because jury service requires sacrifice, many citizens try to avoid this obligation. Our office should set a good example by our willingness to serve, and we should be positive about our justice system and encourage all citizens to take part.
>
> Every employee is to notify their respective supervisor immediately upon the receipt of a jury notice so that arrangements can be made to cover the employee's office assignments. **Attorneys should also bring the matter to the attention of the judge of their court where appropriate.** On each day at the conclusion of jury service, the employee shall return to work at the office, unless it is after office hours. All jury fees belong to the employee and will not affect an employee's pay.

17. The Jury Duty policy instructed Ms. Hagan that "it is the office policy that employees serve rather than seek to be excused or exempted."

18. The policy further instructed that employees must notify their supervisor immediately upon the receipt of a jury notice.

19. Ms. Hagan complied with this policy in every respect.

20. In May 2024, Ms. Hagan received a jury summons for service on a jury scheduled for July 8, 2024.

5

21. Ms. Hagan immediately notified her immediate supervisor, Emily Todoran, as well as Defendant, via email on May 31, 2024, that she had received a jury summons.

22. Defendant was thus aware, as of May 31, 2024, that Ms. Hagan had received a jury summons and intended to serve on a jury, as Defendant's own office policy required.

23. Ms. Hagan ultimately appeared for jury service on July 15, 2024. (The July 8 date had been rescheduled.)

24. As established, prior to her service, Ms. Hagan notified her immediate supervisor of her jury service.

25. Defendant was aware that Ms. Hagan was serving on a jury.

26. The case for which Ms. Hagan was summoned to jury service was *State of Tennessee v. Karlos Reynolds*, 2023-B-1023, Davidson County Criminal Court, Judge Cynthia Chappell presiding.

27. The case involved three criminal counts: public intoxication, unlawful possession of a handgun while under the influence, and aggravated assault.

28. On the Judge's list of potential jurors, Ms. Hagan was juror number 9.

29. Based on the Criminal Court's practices and procedures, the first twelve jurors on the list were seated in the jury box.

30. In other words, by luck of the draw, Ms. Hagan was placed in the jury box at the beginning of the *voir dire* (jury selection) process and would presumptively

serve on the jury unless either the Court removed her for cause or one of the parties utilized a peremptory challenge to remove her from the jury.

31. In opening remarks to the venire, Judge Chappell emphasized the importance of jury service in the American legal system, explaining:

> We all enjoy lots of privileges as Americans, and in turn, one of the things that we all do is place ourselves out there to serve on a jury. So, on the one hand, it's a duty that we have, but on the other hand, it's really so critical that everyone has a right to serve on a jury. It doesn't matter if you have a formal education, or life education, whether -- where you went to school, where you live, what you do for a living, your race, your gender. Any of those things. None of those things exclude you from having the honor of serving on a jury.

> (Trial Transcript, p. 11, lines 7-17.)

32. Judge Chappell then instructed the members of the jury pool to "let us know if you know somebody in the courtroom, or if you know a witness, or recognize a party." (Trial Transcript, p. 12, lines 14-16.)

33. Ms. Hagan raised her hand to get the Judge's attention, leading to the following exchange:

7

```
22               Any connection with any of those people?  I
23   don't see anyone -- oh.  Ms. Hagan.
24               MS. HAGAN:  I just --
25               THE COURT:  And I don't know everybody's
```

```
 1   name, but Ms. Hagan is a lawyer here in the court system.
 2   So I happen to know her.
 3               MS. HAGAN:  I just wanted to say that I do
 4   know everybody here, so.
 5               THE COURT:  Yes.  Thank you, Ms. Hagan.  So
 6   you'll be our expert juror today.
```

(Trial Transcript, p. 13, line 22 – p. 14, line 6.)

34. Ms. Hagan thus clearly complied with the Court's instruction to "let us know
    if you know somebody in the courtroom" by informing the Court "I do know
    everybody here."

35. Further, the Court *recognized* Ms. Hagan and knew that Ms. Hagan "is a
    lawyer here in the court system."  Nevertheless, the Court stated that Ms.
    Hagan would be the Court's "expert juror today."

36. During specific questioning by Wesley Holder, one of the Assistant District
    Attorneys prosecuting the case for the State, Ms. Hagan further identified
    herself as an Assistant District Attorney:

```
5                    GENERAL HOLDER:  Okay.  Thank you so much.

6                    I want to pick on Ms. Hagan now.  It's your

7    turn.

8                    MRS. HICKS HAGAN:  Okay.  I'm Katie Hagan.  I

9    am married.  I have two children.  They are 15, 17.  I am

10   employed as an Assistant District Attorney.  So you all

11   are my colleagues.  I like to -- for fun, I primarily am

12   just wherever my kids are at a sporting event.  That's

13   where I spend all my time.
```

(Trial Transcript, p. 25, lines 5-13.)

37. Ms. Hagan thus clearly identified herself as an Assistant District Attorney
    and identified the prosecutors on the case as "my colleagues."

38. Later, in questioning by Leah Wilson, the criminal defense attorney for Karlos
    Reynolds, Ms. Hagan discussed prior service on a civil jury, and testified that
    she could be fair and impartial in the case at hand:

```
 5                MS. WILSON:  Did you all reach a verdict?

 6                MRS. HICKS HAGAN:  I was excused as an

   alternate at the end of the proof, and so I don't know

 7

 8  whether they ended up. . .

 9                MS. WILSON:  Anything about that experience

10  that you think would keep you from being fair and

11  impartial in this case?

12                MRS. HICKS HAGAN:  No.
```

(Trial Transcript, p. 53, lines 5-12.)

39. Following the *voir dire*, there was a bench conference between Judge Chappell, Assistant District Attorney Luis Casas, and Leah Wilson.  Assistant District Attorney Casas specifically mentioned Ms. Hagan as a potential juror who should be considered for a strike for cause:

```
18              GENERAL CASAS:  Judge.  I thought there might
19    be two for cause.  One of them being Mrs. Hagan, who works
20    for Glenn Funk, and the other being Juror No. 2, I believe
21    it was, who was crying.  She did say that she would not
22    feel comfortable standing in judgement.
23              THE COURT:  Juror No. 2 will be excused for
24    cause on your request for that.  On Ms. Hagan, Juror
25    No. 9, she said that she could be fair, and I don't think
```

```
1    simply her employment with the Prosecutor's Office makes
2    her unfit.
3              GENERAL CASAS:  Thank you, Judge.
4              THE COURT:  All right.  Thank you.
```

(Trial Transcript, p. 112, line 18 – p. 113, line 4.)

40. Despite each side's being allotted a total of nine peremptory strikes per side, neither side utilized a strike against Ms. Hagan, a fact the Court noted on the record:

```
5            THE COURT:  All right.  I would like the
6     record to reflect that neither side used all of their
7     peremptory challenges.
8            Is there anything else, Counsel?
9            GENERAL HOLDER:  No, your Honor.
```

41. Each side used two peremptory strikes against other jurors.  Thus, the full context of the Court's comment above that "neither side used all of their peremptory challenges" is that each side had seven remaining challenges, but elected not to challenge Ms. Hagan.

42. Ms. Hagan thus served as a member of the jury in the case after 1) the Court declined to strike her for cause, 2) the criminal defense attorney representing the defendant declined to utilize an available peremptory challenge, and 3) the Assistant District Attorneys prosecuting the case, who suggested to the Court that Ms. Hagan should be excused for cause based on her employment in the prosecutor's office, also did not utilize an available peremptory challenge.

43. At the conclusion of the case, before jury deliberations, the Court randomly selected an alternate, meaning a person who would not deliberate on the case. The Court selected Juror No. 5, meaning that Ms. Hagan would proceed to

serve as a juror during the deliberation phase. (Trial Transcript, p. 212, lines 21-25.)

44. Not surprisingly, Ms. Hagan was ultimately selected as the foreperson of the jury.

45. The jury deliberated for less than one hour before returning not guilty verdicts on all counts. (Trial Transcript p. 213, line 9 – p. 216, line 18, noting that deliberations began at 3:35 p.m. and the jury was excused at 4:20 p.m.)

## II.     Aftermath and Retaliation

46. At the conclusion of the trial in the *Reynolds* case, Ms. Hagan went home.

47. Ms. Hagan appeared for work the next day on July 16, 2024, without incident.

48. On Wednesday, July 17, 2024, Ms. Hagan was out of the office for a doctor's appointment.

49. That afternoon, Ms. Hagan received a text message from Emily Todoran saying that Ms. Todoran was going to cover Ms. Hagan's Thursday docket because Defendant needed to talk to Ms. Hagan.

50. On Thursday, July 18, 2024, Ms. Hagan met with Defendant, as well as Amy Hunter and Roger Moore, who are both Deputy District Attorneys.

51. In this meeting, Defendant berated Ms. Hagan for her jury service and accused her of being unethical.

52. Defendant specifically took issue with the jury's returning a verdict of "not guilty" and told Ms. Hagan that the "not guilty" verdict could strain her

relationship with law enforcement officers in the Metro Nashville Police Department.

53. When she left the meeting, she was told that she could not work as an attorney and needed to be "on leave."

54. Defendant expressed outrage at Ms. Hagan's service as the foreperson on the jury.

55. In a letter hand-delivered to Defendant on August 28, 2024, Ms. Hagan outlined the course of events following the July 18 meeting:

> "At our next meeting between you and I on July 22nd, I told you how I felt about everything. You listened to what I had to say, but still have never asked me about the actual substance of the trial. **You have reiterated to me that you have concerns about my inability to have the confidence of the police department and that my act of serving on a jury that returned a not guilty verdict has caused some hardship for the office with the police department.** Again, I've expressed to you that I do not believe this to be true and I have listened attentively to all your concerns. When we left this meeting on Monday, July 22nd, you told me that you would get back to me on Friday July 26th and let me know what you wanted me to do.
>
> I next heard from you on Monday, July 29th. I came to the office that morning prepared to work. You asked me to meet you at 11:30. You and I met privately and **at the end of this meeting you stated that you were taking me out of General Sessions and removing me from the courtroom because you have concerns about my ability to have the trust of the police officers that I would be working with in Court.**
>
> Over the course of the past six months that I have been working in General Sessions, I have not had any issues with police officers. Many of them know that I had been a defense attorney for the previous 18 years and I believe most of them had a ton of respect for me and for the work that I have been doing. **Your proposal for my new assignment is to review U-Visa applications (a job that a current investigator and Victim**

**Witness coordinator has been doing) and to review old blue files to see if they can be destroyed.** You have indicated that this would be my assignment at least until January or February of 2025."

56. The letter concluded with a formal written request that Defendant restore Ms. Hagan to her previous role: "I want you to restore me to my General Sessions Assistant position that you hired me to perform. I would request that you place this letter into my permanent personnel file."

57. On Monday July 22, 2024, the week after her jury service, Ms. Hagan was placed on leave and told by Defendant to stay home and not come into the office.

58. On Monday July 29, 2024, Ms. Hagan met with Defendant, who said he was going to reassign Ms. Hagan to the task of reviewing U-Visa applications—a task for which no law degree or law license is required.

59. The reassignment from actual prosecutorial, legal work in a courtroom to an office role reviewing U-Visa applications was a demotion.

60. Following this demotion, Ms. Hagan became an office pariah. Her fellow co-workers and colleagues were afraid to be seen with Ms. Hagan for fear of drawing the wrath and ire of Defendant.

61. The reassignment and demotion caused Ms. Hagan embarrassment and created the false impression that she had done something wrong by serving on a jury.

62. Ms. Hagan worked in this demoted role, reviewing visa applications, for approximately one month before finally writing a letter to Defendant asking to be reinstated and restored to her attorney role for which she was hired.

63. Ms. Hagan hand-delivered the letter asking to be reinstated to Defendant on August 28, 2024.

64. Following the receipt of this letter by hand-delivery on August 28, 2024, Defendant did not restore Ms. Hagan to her prior role as an Assistant District Attorney assigned to General Sessions Court.

65. On Friday, September 6, 2024, having heard nothing from Defendant and having continued to review U-Visas in the ensuing week, Ms. Hagan sent an email to Defendant, and copied Deputy District Attorneys Amy Hunter and Roger Moore, and Emily Todoran, Ms. Hagan's immediate supervisor. The email referenced the August 28 letter and attached a copy of the letter to the email.

66. On Monday, September 9, 2024, Ms. Hagan appeared for work. Ms. Hagan was told from co-workers that Defendant had stated that he would not allow Ms. Hagan to be placed back in General Sessions Court until March or April 2025.

67. That is, despite his previous position that Ms. Hagan could return to work in her attorney role in January or February 2025, Defendant pushed this timeline out to March or April 2025 after receiving the August 28 letter and after Ms.

Hagan re-sent that letter on September 6 (cc'ing her supervisor and Deputy District Attorneys Hunter and Moore).

68. Defendant was aware that one of the main reasons Ms. Hagan agreed to work for the D.A.'s office was the attraction of courtroom work and regular courtroom appearances.

69. Defendant's intentional demotion and reassignment of Ms. Hagan to an office role involving no actual legal work requiring a law degree or law license was specifically calculated to punish Ms. Hagan for her jury service.

70. At no point did Defendant mention or acknowledge that his own office has an official policy relating to service.

71. On September 10, 2024, Ms. Hagan resigned.

## III.    Prior Bad Acts of Defendant – Similar First Amendment Retaliation

72. On September 25, 2024, roughly two weeks after Ms. Hagan's resignation following her demotion and constructive discharge by Defendant, the Office of the Comptroller of the Treasury released a damning report relating to "allegations of malfeasance related to the 20th Judicial District Attorney General's Office"—that is, allegations of malfeasance by Defendant.

73. The report details highly questionable, unethical, and probably criminal misconduct by Defendant.

74. For example, the report concludes:

> "Government employees surveilled and monitored audio and video recordings of criminal defense attorneys, office employees, other tenants, and visitors on the building's Premises without their knowledge or consent using a government-owned surveillance system." (Report, p. 2.)

75. The report further concludes that "conversations of criminal defense attorneys were audio and video recorded." (Report, p. 2.)

76. The Comptroller's report concluded that such conduct could very well rise to the level of criminal misconduct, noting:

> "The audio recording practices and procedures implemented in the office using government-owned equipment could implicate the statutory provisions of Tenn. Code Ann. §§ 39-13-601 *et. seq.* It is unlawful for any person to intercept or use any oral communication without the consent of one or more parties to the communication. Tenn. Code Ann. § 39-13-601." (Report, p. 5.)

77. Beyond unlawfully recording and surveilling criminal defense attorneys, Defendant surveilled his own office employees, presumably including Ms. Hagan.

78. The report notes that "office employees' and visitors' conversations were captured without their knowledge and consent." (Report, p. 6.)

79. Most damningly, the report details an instance of retaliation and demotion involving an Assistant District Attorney under circumstances strikingly like those at issue in this Complaint involving Ms. Hagan.

80. The report describes this episode of retaliation as follows:

> On or about January 2022, a family member of a former Assistant District Attorney (ADA) made a social media post in support of the District Attorney General's 2022 campaign opponent. **After learning that the ADA's family member spoke in support of one of his political opponents, the District Attorney General received a contribution to his reelection campaign from the former ADA.** The District Attorney General directed office personnel to conduct office surveillance of the former ADA without the former ADA's knowledge or consent using its government-owned surveillance system**, and the District Attorney General reassigned the former ADA from a criminal court team to a grant-funded position.**" (Report, p. 9, emphasis added.)

81. Exhibit 8 to the report, identified as a "Communication between an individual and the District Attorney General discussing the former ADA's family member's social media post," evidences the scheme to demote the Assistant ADA in retaliation for the political speech of her family member, who supported Defendant's opponent during Defendant's reelection campaign. (Report, p. 9.)

82. The communications must be seen to be believed:

Exhibit 8



83. The unidentified correspondent in the above exchange advises Defendant to "keep her on a tight leash until May. Then fire her if you want to haha."

84. Upon information and belief, Defendant hatched a similar plan and scheme to ultimately terminate Ms. Hagan, planning to "keep her on a tight leash" and then "fire her."

85. The unidentified correspondent then wrote: "I don't want you to seem Trumpish to people who don't know you and have them think you fired her just because someone disagrees with you."

86. The report concludes:

> "In these communications, it appears the District Attorney General was being advised to wait until after the May 2022 election to terminate the employment of the former ADA if he wanted to because it could be used against him by his political opponent if done prior to the election. The former ADA

subsequently resigned from the office on or about July 2022."
(Report, p. 10.)

87. The report further details another apparent instance of criminal misconduct
by Defendant—soliciting a campaign contribution from the Assistant District
Attorney and describing the campaign contribution as "the only way you could
make this any better." (Report, p. 10.)

88. The report details a meeting between Defendant and the former Assistant
District Attorney in which the Defendant stated as follows:

> "*Everyone in this office knows about that post.* (the former ADA
> interpreted this as he was implying that she was lying about not
> having known about it). *I would never ask you to get involved in
> politics, but I think **the only way you could make this any better
> is if you donated a significant amount of time or money,** but I
> don't ask anyone to do that.*" (Report, p. 10, emphasis added.)

89. The report then includes a redacted photo of a check from the former ADA to
the Defendant in the amount of $500, pictured below:

**Exhibit 9**



*Check written to the District Attorney General's reelection
campaign by the former ADA.*

90. The report concludes that Defendant's solicitation of this check may have violated Tennessee law:

> "The solicitation or acceptance of the $500 check could implicate the provisions of Tenn. Code Ann. § 39-16-102, which states that it is unlawful for a public servant to solicit, accept or agree to accept money or other pecuniary benefit with an agreement or understanding that such payment will influence action by the public servant. Likewise, it is unlawful to use coercion to obtain money or property from another person. Tenn. Code Ann. § 39-14-112. Additionally, it is unlawful for an elected official to intimidate, coerce, or command a subordinate to make a campaign contribution. Tenn. Code Ann. § 2-19-202." (Report, p. 10.)

91. The Defendant, according to the report, "confirmed that the meeting took place, [and] told investigators that he accepted the $500 check." (Defendant claimed he did not cash the check.) (Report, p. 11.)

92. The report further concludes that "The District Attorney General reassigned the former ADA's position within the office." (Report, p. 11.)

93. That is, Ms. Hagan is at least the *second* Assistant District Attorney to be reassigned and demoted by Defendant under circumstances amounting to punishment for protected activities (political speech, jury service.)

94. The report more specifically details the demotion of the former ADA as follows:

> "The former ADA informed investigators **that shortly after the May 2022 election, she was reassigned from a criminal court prosecutor (ADA) position to a grant prosecutor (ADA) position.** This reassignment was initiated by the District Attorney General, and **various individuals within the office familiar with the duties and responsibilities of both positions informed investigators that they would consider the reassignment to be a demotion**." (Report, p. 11, emphasis added.)

95. Defendant's reassignment of the former ADA from criminal court to a grant prosecutor position mirrors his reassignment of Ms. Hagan from criminal court to reviewing U-visa applications.

96. Similarly, Defendant's reassignment of the former ADA was widely viewed as a demotion—just as his reassignment of Ms. Hagan was similarly viewed as a demotion.

97. Like the former ADA, Ms. Hagan resigned after Defendant's retaliatory actions rendered continued employment untenable, unbearable, and utterly intolerable to any reasonable person.

98. Ms. Hagan specifically pleads that punitive damages are available to punish the Defendant for his continued pattern of violating the First Amendment rights of his employees.

## CAUSES OF ACTION:

## I. First Amendment Retaliation (42 USC § 1983)

99. Plaintiff reincorporates all above paragraphs.

100. Ms. Hagan's action in serving on a jury in response to a Court summons constituted a protected activity.

101. Ms. Hagan's action in voting "not guilty" during her jury service also constituted a protected activity.

102. Defendant took several adverse actions against Ms. Hagan because of her protected conduct, including demoting her, reassigning her to non-attorney work, removing her from courtroom work, placing her on leave, and berating her in front of her superiors and colleagues.

103. Defendant did not even pretend his adverse actions were motivated by anything other than Ms. Hagan's jury service—in fact, he explicitly referenced her jury service and even chastised Ms. Hagan for her service as the foreperson of the jury.

104. Ms. Hagan's jury service was the causal factor in Defendant's adverse actions taken against her for her jury service.

105. Defendant's retaliatory treatment of Ms. Hagan for her jury service would deter her fellow employees and coworkers of ordinary firmness from jury service in the future.

106.    For these reasons, Defendant may be held liable for retaliation in violation of the First Amendment.

107.    Plaintiff seeks compensatory damages as well as injunctive relief, including reinstatement, for Defendant's unlawful retaliation.

108.    Plaintiff further seeks punitive damages for Defendant's intentional and malicious conduct, including his specific intent to punish Ms. Hagan by reassigning her to work specifically calculated to make her miserable—all for honoring her solemn civic obligation of jury service.

## II. State Law Claim for Reinstatement and Reimbursement for Lost Wages Pursuant to T.C.A. § 22-4-106

109.    Plaintiff reincorporates all above paragraphs.

110.    Tennessee law creates a private right of action for individuals who suffer retaliation from their employer because of their jury service.

111.    The applicable statute is T.C.A. § 22-4-106 ("Employment; excused absence; compensation; violation.")

112.    The statute provides in relevant part:

> (2)    **(A) Any employee who is discharged, demoted or suspended because the employee has taken time off to serve on jury duty is entitled to reinstatement and reimbursement for lost wages and work benefits caused by such acts of the employer.**
>
> (B) Any employer who willfully refuses to rehire or otherwise restore an employee or former employee commits a Class A misdemeanor.
>
> (e) Any employer who violates this section commits a Class A misdemeanor.
>
> (f) For the purposes of this section, "employer" includes, but is not limited to, the state of Tennessee or any local government.

113.    Ms. Hagan was an employee in Defendant's office at the time she was demoted and constructively discharged.

114.    Ms. Hagan was required by law to serve on a jury.

115.    Ms. Hagan provided the required statutory notice to her employer informing her employer of her jury service.

116.    Defendant retaliated against and demoted Ms. Hagan because of her jury service.

26

117.     Ms. Hagan's jury service was a substantial factor in Defendant's acts of retaliation and demotion of Ms. Hagan.

118.     In fact, Ms. Hagan's jury service was the *sole* factor in Defendant's acts of retaliation, demotion, and constructive discharge.

119.     Ms. Hagan presented Defendant with a letter, on August 28, 2024, clearly outlining her position that Defendant's actions of reassigning and demoting her were unfair acts causally related to her service on a jury.

120.     In the letter, Ms. Hagan demanded reinstatement to her previous role.

121.     Defendant refused to restore Ms. Hagan to her previous position doing actual attorney work, including appearing in the courtroom.

122.     In fact, Defendant apparently increased the scope and degree of his acts of retaliation by extending the period of demotion from February 2025 to as late as April 2025.

123.     Defendant is thus liable under Tennessee state law for violation of this statute, which creates a private right of action.

124.     The acts complained of were intentional and malicious, as described above, and taken with the very purpose of inflicting punishment on Ms. Hagan.

125.     These acts transcend ordinary negligence and sound instead in a theory of intentional tort.

## PRAYER FOR RELIEF

126.   Plaintiff respectfully requests that this Court enter judgment in her favor

and against Defendant, and award her all relief as allowed by law and equity,

including, but not limited to the following:

    a.  Compensatory damages, including, but not limited to those for past

       and future pecuniary and non-pecuniary losses, humiliation,

       discomfort, fear, anxiety, loss of enjoyment of life, loss of liberty, and

       other non-pecuniary losses;

    b.  Punitive damages for all claims as allowed by law in an amount to be

       determined at trial;

    c.  Injunctive relief ordering Defendant to restore and reinstate Ms.

       Hagan to her position as a District Attorney General assigned to

       General Sessions Court;

    d.  Attorney's fees and costs; and

    e.  Such further relief as justice requires.

Respectfully submitted,

DRS LAW

*/s/ Christopher Smith*
David Randolph Smith, TN BPR#011905
Dominick R. Smith, TN BPR # 028783
Christopher W. Smith, TN BPR #034450
1913 21st Avenue South
Nashville, Tennessee 37212
(615) 742-1775 phone
(615) 742-1223 fax
csmith@drslawfirm.com

*Attorneys for Plaintiff*